# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R. L.,                                          :
                                                :
                          Petitioner            :
                                                :  **CASE SEALED**
              v.                                :  No. 634 C.D. 2019
                                                :  Submitted:  March 24, 2020
Department of Human Services,                   :
                                                :
                          Respondent            :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge (P.)
           HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                    FILED:  May 14, 2020


          R.L. (Petitioner) petitions for review of the May 3, 2019 order of the
Department of Human Services, Bureau of Hearings and Appeals (Department),
adopting the recommendation of an administrative law judge (ALJ) to deny
Petitioner's appeal from an indicated report of child abuse.  The Office of Children
Youth and Families (OCYF) filed the indicated report with the ChildLine and Abuse
Registry (ChildLine)[1] after determining that Petitioner's actions in falling asleep
during her overnight shift at a childcare center created a reasonable likelihood of
bodily injury to four-year-old Z.S., who left the facility while Petitioner was
sleeping.  Following a hearing, the ALJ denied Petitioner's appeal, finding that

---

[1] ChildLine, a unit within the Department, is a statewide system that receives reports of
suspected child abuse, refers reports for investigation, and maintains the reports for reference.  *See*
Section 6331 of the Child Protective Services Law (CPSL), 23 Pa. C.S. §6331.

Petitioner left Z.S. unsupervised in the early morning, which created a reasonable likelihood of bodily injury to the child. The ALJ also found that Petitioner's actions on September 9, 2018, constituted a gross deviation from the standard of care that a reasonable person would have observed.

Facts/procedural history

Petitioner was employed as a childcare worker at Baring House Crisis Nursery (Baring House), an emergency and respite childcare center situated in a residential area in Philadelphia, north of Drexel University. During her overnight shift on September 8-9, 2018, Petitioner and a coworker were responsible for two children. At some time between 2:30 a.m. and 3:15 a.m., Petitioner fell asleep. While she was sleeping, four-year-old Z.S. got up, went downstairs, unlocked the front door, and left the facility. He was returned, unharmed, by two police officers.

On September 9, 2018, OCYF received a referral that a child had left the crisis center's premises. OCYF representative Christopher Pol (Pol) conducted an investigation, during which he interviewed Petitioner, her coworker (T.T.), Baring House program manager Leslie Rinehart, and Z.S.'s mother. During her interview, Petitioner recounted the events to Pol as follows. At 11:00 p.m., when she arrived to start her shift, Z.S. came to the top of the stairs and asked for his mother. In response, Petitioner read him a book and stayed with him until he fell to sleep. Z.S. woke up again at about 2:20 a.m. Petitioner helped him use the bathroom and stayed with him until she believed he was sleeping. Sometime thereafter, Petitioner fell asleep. She woke when the police arrived at Baring House at 3:15 a.m. The police entered the facility through the unlocked front door. Petitioner went to check on Z.S. and realized he was missing.

2

On November 5, 2018, OCYF filed an indicated report of child abuse naming Petitioner as a perpetrator of physical abuse against Z.S.[2] On November 6, 2018, the Department notified Petitioner that her name would be listed as a perpetrator on an indicated report of child abuse. Petitioner filed an appeal of the Department's decision requesting that the indicated report be expunged.

At a March 19, 2019 hearing before the ALJ, Petitioner confirmed the information she provided to Pol. She testified that on September 8, 2018, there were two children in care when she began her shift, which started at 11:00 p.m. Saturday evening. Petitioner said that when she arrived, Z.S. got up and asked for his mother. Petitioner helped him back to bed and read to him until he fell asleep. Petitioner stayed in the adjacent family room until T.T. arrived around midnight, and then she went downstairs and did chores.[3] Petitioner specifically remembered locking the door.

Petitioner said that after finishing her chores she went upstairs and checked on the children. She found one child asleep in a crib and Z.S. sleeping with his head at the foot of his bed. She turned him around and left him, still asleep, and went to the family room. Petitioner stated Z.S. got up again around 2:00 a.m., came to the family room where Petitioner was watching television, and asked her for help

---

[2] The record reflects that T.T. also was indicated as a perpetrator of child abuse. The ALJ denied the Department's request to continue the hearing, noting that T.T. had not filed an appeal from the indicated report as of the hearing date. Notes of Testimony, ALJ's March 19, 2019 hearing (N.T.) at 12-13. During her testimony before the ALJ, T.T. stated that she had appealed the indicated report by writing a letter to the Department and was waiting to receive notice of a hearing. The ALJ advised T.T. that her testimony could be used against her in an appeal.

[3] Petitioner's chores included taking out trash from classrooms, sanitizing toys, cleaning dishes, sweeping and mopping, and emptying water under a sink in the baby room. N.T. at 112.

3

going to the bathroom. Petitioner testified that she returned him to the toddler room next door to the family room and believed he went back to sleep.

Petitioner acknowledged that the center's overnight shift policy required her to remain awake. She admitted that she had fallen asleep during overnight shifts in the past, but only when no children were in her care. Petitioner added that on September 8, 2018, she took a three-hour nap before work, drank coffee while she was doing her chores, watched television, and played games on her phone to remain awake. She said that despite those efforts, she accidentally dozed off while she was sitting – not lying – on the couch. Petitioner testified that she did not mean to fall asleep; she did not decide to close her eyes; and she did not decide to doze off. N.T. at 120-21. Petitioner also noted that to leave the center, Z.S. had to walk down a hall, down steps, turn and walk down another hallway, opening a half-door and passing the family room and the office where T.T. was on duty, and then go downstairs. N.T. at 136-37.

T.T. testified that she arrived at Baring House around midnight to work the midnight to 8:00 a.m. shift. She said that when Petitioner completed her chores at approximately 2:00 a.m., Petitioner went upstairs, and T.T. went downstairs to begin her assigned chores. T.T. testified that she finished her chores, grabbed a snack and a blanket, and went upstairs to the office. T.T. stated she was in the office upstairs between 2:20 a.m. and 3:15 a.m. when Z.S. likely left Baring House. T.T. acknowledged that she fell asleep at some point during her shift.

Rinehart testified that Baring House has a policy requiring overnight workers to remain awake and check on the children every 30 minutes. Rinehart stated that employees are informed of these requirements at the time of hire as well as during an orientation with a supervisor. Rinehart added that after the incident,

4

Baring House created a new safety plan, which included adding alarms to the doors and moving the locks higher and out of reach of young children.

Pol testified that the Department believed there was a reasonable likelihood that Z.S. could have sustained bodily injury by walking by himself down a busy street in the middle of the night. Pol stated that Petitioner knew Baring House's policy required her to remain awake during her overnight shift. He noted that Petitioner was aware that Z.S. missed his mother and wanted to be with her. Pol said that Petitioner disregarded the childcare center's policy and the child's behavior and fell asleep. The agency also introduced a CPSL investigative report, which indicated that Z.S. was found "walking down the street near enough to the road" that he was spotted by a passerby. Record Item C-10.

The ALJ found the testimony of Rinehart and Pol credible. The ALJ found the testimony of T.T. and Petitioner credible to the extent that they were working at Baring House on September 9, 2018, and, while they were sleeping, Z.S. left the facility. The ALJ concluded that by falling asleep, Petitioner left Z.S. without adult supervision in the early morning and thereby created a reasonable likelihood of bodily injury to Z.S. The ALJ made no findings as to where Z.S. was found. Nevertheless, without reference to any evidence, the ALJ stated it was pure happenstance that the child was located and that he was not injured, abducted, or killed.

The ALJ concluded that OCYF had proved by substantial evidence that Petitioner acted recklessly in that she consciously disregarded a substantial risk of harm when she fell asleep. The ALJ characterized Petitioner's conduct as a gross deviation from the standard of care that a reasonable person would maintain and clearly more than an error or lapse of judgment. The ALJ recommended that

Petitioner's appeal be denied, and the Department adopted that recommendation in its entirety.

Discussion

On appeal to this Court,[4] Petitioner argues that the Department erred in concluding that she acted "recklessly," as contemplated by Section 6303(b.1) of the CPSL, and that she created a reasonable likelihood that Z.S. would suffer bodily injury, as defined by Section 6303(a) of the CPSL. We agree.

Section 6341(a)(2) of the CPSL provides that an indicated report may be expunged on the grounds that it is inaccurate or is being maintained in a manner inconsistent with the law. 23 Pa. C.S. §6341(a)(2). In an expunction hearing, the county agency bears the burden of showing, by substantial evidence, that the indicated report is accurate. *T.H. v. Department of Human Services*, 145 A.3d 1191, 1198 (Pa. Cmwlth. 2016).

In relevant part, Section 6303(b.1)(5) of the CPSL states: "The term 'child abuse' shall mean intentionally, knowingly or recklessly doing any of the following: . . . (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act." 23 Pa. C.S. §6303(b.1)(5). Section 6303(a) of the CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa. C.S. §6303(a). Additionally, Section 6303(c) of the CPSL provides:

> Conduct that causes injury or harm to a child or creates a
> risk of injury or harm to a child *shall not be considered*
> *child abuse if there is no evidence that the person acted*

---

[4] Our scope of review is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether the necessary findings of fact are supported by substantial evidence. *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010). Substantial evidence is "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate in support of a conclusion." 23 Pa. C.S. §6303(a).

6

*intentionally, knowingly or recklessly* when causing the injury or harm to the child or creating a risk of injury or harm to the child.

23 Pa. C.S §6303(c) (emphasis added).

The CPSL defines the terms "intentionally," "knowingly," and "recklessly" as they are defined by Section 302 of the Crimes Code, 18 Pa. C.S. §302. Pursuant to Section 6303(a) of the CPSL, a person acts "recklessly"

when *he consciously disregards a substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and extent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

23 Pa. C.S. §6303(a); 18 Pa. C.S. §302(b)(3) (emphasis added).

Consequently, to demonstrate that the indicated report was accurate, OCYF had to show that by falling asleep, Petitioner consciously disregarded a substantial and unjustifiable risk of harm to Z.S. and created a reasonable likelihood of bodily injury to the child. Whether OCYF's evidence satisfied its evidentiary burden is a question of law. *S.K. v. Department of Human Services*, 206 A.3d 644, 653 (Pa. Cmwlth. 2019).

Petitioner first asserts that she did not act recklessly but, rather, accidentally fell asleep despite taking steps to stay awake and ensure Z.S.'s safety. Citing *S.K.* in support, Petitioner argues that she did not consciously disregard any risk to Z.S. In *S.K.*, a staff member at a residential facility attempted to use an approved method of restraining a minor but ended up using a method that deviated from his training. Specifically, the staff member lifted the minor up and "delivered him to the floor in such a manner that [the minor's] head and neck struck the floor

7

first." 206 A.3d at 647. The minor subsequently was diagnosed with a concussion, and an indicated report was filed naming the staff member as a perpetrator of child abuse. On appeal, this Court held that the agency failed to show that the indicated report was accurate, where the evidence demonstrated that the staff member attempted to de-escalate the situation before physically restraining the minor and attempted to use proper technique. We emphasized that the standard for establishing recklessness requires evidence that an individual first perceived and then ignored a risk, or deemed it unworthy of regard, to an extent that the individual glaringly deviated from conduct that a reasonable person would find acceptable under the circumstances.

Petitioner also relies on *Montgomery County Office of Children and Youth v. Department of Public Welfare* (Pa. Cmwlth., No. 724 C.D. 2010, filed January 12, 2011).[5] In that case, this Court held that a caregiver did not act recklessly when she very briefly left a four-year-old near an aboveground swimming pool, which was surrounded by a four-foot-high fence with a gate that was required to have a self-closing, self-latching mechanism. Unfortunately, the mechanism did not work properly. When the caregiver returned, she found the child had drowned.

The caregiver was named as a perpetrator in an indicated report of child abuse. An ALJ granted the caregiver's request for expungement. On appeal, this Court affirmed. In doing so, we explained that the question was whether the caregiver, by entering her home and leaving the child unattended for one minute, disregarded a substantial and unjustifiable risk posed by an aboveground swimming pool enclosed by a gate she believed was properly secured.

---

[5] Under section 414(a) of this Court's Internal Operating Procedures, an unreported opinion may be cited for its persuasive value. 210 Pa. Code §69.414(a); *Burns v. Department of Human Services*, 190 A.3d 758, 765 n.10 (Pa. Cmwlth. 2018).

Petitioner argues that, as in *S.K.* and *Montgomery County*, the totality of the circumstances demonstrates that she did not have knowledge of or disregard a substantial risk of harm to Z.S.

In response, the Department argues that Petitioner knew that the policy of Baring House required her to remain awake during her overnight shift. According to the Department, Petitioner also knew that Z.S. was experiencing anxiety and was missing his mother. The Department asserts that Petitioner disregarded her knowledge of Baring House's policy and Z.S.'s distress when she fell asleep.

The Department contends that the facts are similar to those in *C.I. v. Department of Human Services* (Pa. Cmwlth., No. 891 C.D. 2017, filed May 11, 2018). The caregiver in *C.I.* was responsible for a two-year-old child. The caregiver lived on an operating farm that included outbuildings, a shallow creek, a driveway bridge running over the creek, and a playset. The playset was situated about 35 feet behind the house and was visible from the kitchen windows. There was no barrier between the creek and the home and playset. While the two-year-old and another child were at the playset, the caregiver went inside her home for a few minutes, walked to the child's mother's vehicle and spoke for a few minutes, returned to the kitchen to load the dishwasher and occasionally looked out the windows to observe the children. She then went to an adjacent bathroom for about three minutes to change her clothes, take asthma medication, and brush her teeth. When she returned to the kitchen, she did not see either child at the playset. She later found the victim in the creek, pulled him out, and performed CPR without success.

In *C.I.*, we affirmed the Department's determination that the caregiver disregarded a substantial and unjustifiable risk of drowning to the young child.

9

However, the facts in *C.I.* are easily distinguishable; here, there is no evidence that Petitioner consciously chose to sleep during her shift.

The ALJ described Petitioner's testimony that she "dozed off" as a self-serving attempt to minimize her conduct. However, the ALJ did not find that Petitioner consciously or intentionally fell asleep.[6] Indeed, the ALJ did not address Petitioner's testimony concerning her endeavors to remain awake during her shift, such as napping before work, drinking coffee, and engaging her mind with television and games. Additionally, there is no evidence demonstrating that Petitioner intentionally or consciously disregarded a risk of harm to Z.S. Pol's credible testimony regarding Petitioner's knowledge of the Baring House overnight policy and Z.S. missing his mother is insufficient to establish that Petitioner acted intentionally, knowingly, or recklessly by falling asleep.

Petitioner also argues that she did not create a reasonable likelihood that Z.S. would suffer bodily injury. She contends that it was not foreseeable that the four-year-old child would be able to unlock the front door and would leave the house on his own, rather than again come to his caregiver for assistance. Petitioner argues that she could not consciously disregard risks that she could not foresee.

Section 6303 of the CPSL defines bodily injury as "any impairment of physical condition or substantial pain." 23 Pa. C.S. §6303. Petitioner argues that OCYF did not present evidence showing that Z.S. faced a reasonable likelihood of bodily injury as reflected in the indicated report. Petitioner argues that the agency made no evidentiary showing of the risk to Z.S., inside or outside the facility.

---

[6] In Finding of Fact No. 51, the ALJ states that Petitioner did not intend to "doze off" and thought that T.T. was awake. *See also* ALJ's op. at 13 ("[Petitioner] acknowledged that at some point during her shift she dozed off . . . .").

The Department argues that when Petitioner fell asleep, she created a reasonable likelihood that Z.S. would suffer bodily injury by walking down a busy street in the middle of the night by himself. However, the Department does not assert that Petitioner should have known that Z.S. would attempt to leave the premises or would be able to open the locked door.[7]

Recently, in *S.H. v. Department of Human Services* (Pa. Cmwlth., No. 535 C.D. 2019, filed February 18, 2020), we held that the agency failed to prove that a father acted recklessly when he left his 18-month-old child unsupervised, and out of her pack and play, so she could entertain herself and be quiet while he went to sleep. The child died when her head became caught in a lanyard tucked in a laundry basket. The child had pulled the lanyard out of the laundry basket twice before. The ALJ found that the father's choosing to sleep while his child remained loose was consciously done with disregard of known substantial dangers. On appeal, however, this Court reversed, concluding that there was no evidence showing that the father perceived and then ignored a strangulation hazard from the lanyard, or that he disregarded other substantial risks to the child. "[T]he record is devoid of evidence that [the father] made a conscious decision to sleep *with the knowledge that he exposed* [*the child*] *to a real possibility of bodily injury* from the hazards existing in the bedroom." *Id.*, slip op. at 11 (emphasis added).

In this appeal, as in *S.H.*, even if Petitioner intentionally went to sleep, there is no evidence that she consciously disregarded a risk of substantial harm to Z.S. OCYF presented no evidence identifying a risk of bodily injury to Z.S. or indicating that bodily injury was reasonably likely to occur. There is no suggestion that Petitioner was responsible for ensuring that locks were positioned out of reach

---

[7] The Department does not suggest that Z.S. was at risk of bodily injury *inside* the childcare center.

of young children, or that Petitioner knew Z.S. was capable of reaching and unlocking the front door. Petitioner could not reasonably foresee that the four-year-old would, upon waking in the night, sneak past both her and T.T. (whom Petitioner could not have predicted would also be asleep), unlock the front door, and wander outside. The fact that he asked for his mother earlier in the night indicated he was anxious; however, Z.S. had woken up previously and each time had sought help from Petitioner. In sum, Z.S. did not suffer any bodily injury, and OCYF did not present substantial evidence that a reasonable likelihood of bodily injury existed.

To support an indicated report of child abuse, Section 6303(c) of the CPSL requires "evidence that the person acted intentionally, knowingly or recklessly when causing the injury or harm to the child or creating a risk of injury or harm to the child." 23 Pa. C.S. §6303(c). The Department erred in concluding that OCYF met its evidentiary burden in this matter.

Accordingly, we reverse the Department's adjudication and direct the expunction of Petitioner's indicated report from ChildLine.[8]

_____

MICHAEL H. WOJCIK, Judge

---

[8] Petitioner also raises, as a separate issue, whether application of the "reasonable likelihood of bodily injury standard" to the facts and circumstances of this case would violate the Due Process Clause's prohibition on overly vague statutes. However, we avoid addressing constitutional issues where, as here, a case can be decided on other grounds. *Commonwealth v. Herman,* 161 A.3d 194, 209 (Pa. 2017).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R. L.,                                    :
                                          :
            Petitioner                    :
                                          :   **CASE SEALED**
      v.                                  :   No. 634 C.D. 2019
                                          :
Department of Human Services,             :
                                          :
            Respondent :

O R D E R

AND NOW, this 14th day of May, 2020, the order of the Department of Human Services, Bureau of Hearings and Appeals, is REVERSED, and R.L.'s indicated report is ORDERED to be removed from the ChildLine and Abuse Registry.

_____
MICHAEL H. WOJCIK, Judge